UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                        :      25cv4610 (DLC)
In Re Gol Linhas Aereas Inteligentes    :
S.A., et al.                            :      OPINION AND
                                        :           ORDER
---------------------------------------- X

APPEARANCES:

For appellant William K. Harrington, United States Trustee for
Region 2:
Linda A. Riffkin
Annie Wells
Rachel E. Siegel
Andrew D. Velez-Rivera
Department of Justice
Office of the United States Trustee,
One Bowling Green, Room 534
New York, NY

Ramona D. Elliott
P. Matthew Sutko
Frederick Gaston Hall
Department of Justice
Executive Office for United States Trustees
441 G Street NW, Suite 6150
Washington, DC

For appellees debtors and debtors-in-possession:
Andrew Michael Leblanc
Erin E. Dexter
Milbank LLP
1850 K Street NW, Suite 1100
Washington, DC 20006

Evan R. Fleck
Lauren C. Doyle
Bryan Uelk
Milbank LLP
55 Hudson Yards
New York, NY 10001

Gregory Allan Bray
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067

For appellees Ad Hoc group of Abra Noteholders and DIP Lenders:
Allan S. Brilliant
Gary J. Mennitt
Eric O. Hilmo
Dechert LLP
1095 Avenue of the Americas
New York, NY

For appellees Official Committee of Unsecured Creditors:
Brett H. Miller
Todd M. Goren
James H. Burbage
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY

DENISE COTE, District Judge:

On May 20, 2025, GOL Linhas Aéreas Inteligentes S.A.
("GOL") and its affiliated debtors and debtors in possession
(collectively, "Debtors") filed the Fifth Modified Third Amended
Joint Chapter 11 Plan of Reorganization (the "Plan").  The
Bankruptcy Court entered an order confirming the Plan on May 21.
On June 2, the United States Trustee ("UST") filed an emergency
motion for a stay of the Plan's third-party release and its
related injunction provisions pending an appeal by the UST of
those provisions in the confirmed Plan.  This Court granted a
stay until the parties could be heard.  For the following
reasons, this Court's June 2 interim stay was vacated and the

requested stay pending appeal was denied at a conference on June 5.

## Background

GOL is a large domestic low-cost airline in Brazil with extensive flight networks in South America.  On January 25, 2024, the Debtors filed a voluntary petition in the Southern District of New York for relief under chapter 11 of title 11 of the United States Code.[1]  At that time, the Debtors reported approximately $3.5 billion in assets and $8.3 billion in liabilities.  The Debtors have continued to operate their business as debtors in possession.

On December 26, 2024, as part of its consideration of a proposed plan of reorganization, the United States Bankruptcy Court ordered briefing on proposed releases of non-debtors.  The UST argued, in response, that the op-out mechanism on which the Plan's third-party release is premised is insufficient to procure consent under state law.  On March 17, 2025, the Bankruptcy Court overruled the objection and approved

---

[1] Venue to bring the Debtors' bankruptcy case in New York was based on, among other things, the fact that a GOL affiliate, GOL Finance (Luxembourg), has bank accounts in New York, New York, has a retainer with law firm, Milbank LLP, held in New York, New York, and is an issuer under debt documents governed by New York law with forum selection clauses selecting United States federal courts sitting in Manhattan.

solicitation procedures.  No party objected to the solicitation procedures themselves.

On May 20, the Debtors filed the Fifth Modified Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). The Bankruptcy Court entered an order confirming the Plan on May 21.

The Plan, and every prior version of the Plan, contained a third-party-release provision.  In general terms, Article IX.E, the Plan's third-party-release provision, links the released claims to the bankruptcy proceeding, the Debtors, and financial transactions related to the bankruptcy.  It provides in pertinent part:

> Third-party release: Notwithstanding anything in the
> Plan to the contrary, pursuant to section 1123(b) of
> the Bankruptcy Code, . . . each Releasing Party[2] shall

---

[2] "Releasing Parties" is defined in the Plan as, "collectively, each of the following, in each case in its capacity as such: (i) each of the Released Parties; (ii) all holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; (iii) all holders of Claims or Interests that are Unimpaired under the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable notice; (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties.  For the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not

be deemed to have . . . released, waived, and discharged the Released Parties[3] from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, . . . in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of a Claim or Interest, including any derivative claims or Causes of Action assertable on behalf of any Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of [the Plan and its supporting agreements]. . . .

As the Plan's definition of "Releasing Parties" suggests,

creditors are bound by the third-party release only if they

---

entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests."

[3] "Released Parties" is defined in the Plan as "(i) the Debtors; (ii) the Reorganized Debtors; (iii) the [Official Committee of Unsecured Creditors] and its members; (iv) the other Consenting Stakeholders; (v) the DIP Noteholders, (vi) the Agents/Trustees; (vii) the Ad Hoc Group of Abra Noteholders and Elliott; and (viii) with respect to each of the foregoing Entities and Persons set forth in clause (i) through (vii), each of such Entities' and Persons' Affiliates and its and their respective Related Parties."

did not opt out of the third-party release by checking the appropriate box on the ballot sent to them.  The Order confirming the Plan also includes an injunction that, upon the Plan's effective date, implements the third-party releases by permanently enjoining actions to enforce released claims brought against the Released Parties.

Nearly 700 ballots were mailed to voting creditor classes. Only 63 of those were returned undeliverable.  Among voting creditors, a total of 166 opt-outs were received on standard ballots.  Another 157 opt-outs were received on "Master Ballots."[4]  In addition, over 2,600 notices were sent to three non-voting creditor classes.  Nearly 70 of those were returned as undeliverable.  Fourteen were returned by non-voting creditors, 11 of them with the opt-out box checked.  The instructions regarding the third-party release were prominently displayed on the ballots and the rest of the Plan materials. The response to the ballots showed overwhelming support for the Plan.

---

[4] Master Ballots were sent to so-called "Nominees," or record holders of claims for one or more beneficial holders.  The Nominees who received Master Ballots collected voting information from their beneficial holder clients and filled out Master Ballots to reflect their clients' votes.

All objections to the Plan had been resolved by May 20, except one.  The UST had filed an objection to the confirmation on May 9 in which it objected to the third-party releases and the related injunction.  Following oral argument on May 20, the Bankruptcy Court overruled the UST's objection.  It explained its reasons for doing so in an Opinion filed on May 22.  In re GOL Linhas Aereas Inteligentes S.A., No. 24-10118 (MG), 2025 WL 1466055 (Bankr. S.D.N.Y. May 22, 2025) ("May 22 Opinion").

On May 23, the UST filed a notice of appeal from the Confirmation Order.  On May 27, the UST filed its Statement of Issues for appeal.  It challenges the third-party releases and the related injunction provisions.

Rule 3020(e) explains that unless a bankruptcy court "orders otherwise, a confirmation order is stayed for 14 days after its entry."  Fed. R. Bank. P. 3020(e).  By agreement of the parties, the May 21 Confirmation Order provided that it would be "effective and enforceable immediately upon its entry" except those aspects of the Plan to which the UST had objected. During the 14-day period, the Debtors and UST conferred about the preservation of the UST's appellate rights.  The Debtors agreed that they would not argue to the Bankruptcy Court or any future court with respect to UST's appeal that the appeal was equitably moot.  The Official Committee of Unsecured Creditors

("UCC") and Plan proponents Abra Group Limited and Abra Global
Finance (collectively, "Abra") also agreed not to argue that any
appeal is equitably moot.

On May 29, the UST moved the Bankruptcy Court for an
Expedited Motion for a Stay of the Confirmation Order Pending
Appeal.  The Debtors, the UCC, and Abra objected to the motion
and on May 30, following oral argument, the Bankruptcy Court
entered an order denying the UST's motion for a stay pending
appeal.

On June 2, the UST's Notice of Appeal was docketed in the
District Court.  That same day, the UST filed an Emergency
Motion to Stay, seeking an order staying the non-debtor release
and related injunction provisions of the Plan pending appeal
("Trustee's Motion").  In the alternative, the UST sought a stay
of the Confirmation Oder in the event the Debtors take the
position that the third-party release and injunction provisions
are non-severable.  The UST also requesting that a hearing be
held on or before June 4.  An Order of June 3 set a schedule for
briefing, scheduled a June 5 conference, and imposed an interim
stay of the Plan's third-party release and injunction provisions
until June 6, 2025.

At the conference on June 5, the Court vacated the interim stay and denied the motion for a stay.  This Opinion explains the reasons for the denial.

## Discussion

A district court functions as an appellate court in reviewing judgments rendered by Bankruptcy Courts.  28 U.S.C. § 158(a).  Bankruptcy Rule 8007 authorizes a party to move in the court where its appeal is pending for "a stay of the bankruptcy court's judgment, order or decree pending appeal." Fed. R. Bank. P. 8007(a)-(b).

"A stay pending appeal is not a matter of right," but rather an "exercise of judicial discretion."  DiMartile v. Hochul, 80 F.4th 443, 456 (2d Cir. 2023).  When deciding whether to issue a stay pending appeal, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  Id. (citation omitted).  The first two factors "are the most critical," and must both be satisfied.  Id. (citation omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of the Court's

discretion." <u>Mahdawi v. Trump</u>, 136 F.4th 443, 449 (2d Cir.
2025) (citation omitted).  There is "substantial overlap"
between these factors and those governing preliminary
injunctions.  <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009).

To satisfy the "success on the merits factor, the moving
party must show that his chance of success on the merits is more
than a mere possibility." <u>DiMartile</u>, 80 F.4th at 456 (citation
omitted).  In the context of a preliminary injunction, the
Second Circuit has explained that a movant may carry its burden
on this prong by showing "sufficiently serious questions going
to the merits to make them a fair ground for litigation." <u>Kelly
v. Honeywell Int'l, Inc.</u>, 933 F. 3d 173, 183-84 (2d Cir. 2019)
(citation omitted).  Finally, "where the government is a party
to the suit, the final two factors merge." <u>Mahdawi</u>, 136 F.4th
at 449 (citation omitted).

I.   Likelihood of Success on the Merits

The legal issue at stake here is whether the Plan
improperly imposes non-consensual third-party releases.  The UST
argues that it has shown a likelihood of success on its legal
argument that the Plan cannot release the claims that GOL's
creditors may have against third-parties without the explicit

consent of those creditors.[5]  It relies on New York contract law,

which it argues is the governing law, for the principle that

silence does not constitute consent to an agreement.

Accordingly, a creditor's failure to opt-out of the release by

checking the appropriate box on the ballot was ineffective.

While the UST does not otherwise object to the Plan, it seeks to

have the provisions of the Plan related to third-party releases

and the related provisions of the injunction stricken.

In his thorough Opinion of May 22, the Honorable Martin

Glenn explained why he rejected UST's objection.  He held that

third-party releases can be a part of chapter 11 plans pursuant

to § 1123(b)(6) of the Code, even after Harrington v. Purdue

Pharma L.P., 603 U.S. 204 (2024).  See May 22 Opinion, 2025 WL

1466055, at *17-25.  In holding that federal and not state law

will apply to the releases, he observed that applying state

contract law "would lead to chaos."[6]  Id. at *21.  Judge Glenn

found that the standard for implied consent set forth in Roell

---

[5] Neither the UST nor any other party has complained that the
released claims are not properly connected to the res of the
Debtors' estate or that there were deficiencies in the process
employed to obtain consent apart from UST's legal objection.

[6] To escape this common sense observation about the challenge
imposed by a choice-of-law analysis in many chapter 11
proceedings, including this one, the UST has proffered that it
is only necessary to consider the forum state's contract law in
the absence of a party's complaint that there is a conflict in
governing law.

v. Withrow, 538 U.S. 580 (2003), and lower court decisions in
this Circuit, governs here.  May 22 Opinion, 2025 WL 1466055, at
*23-24.  As a further limitation, Judge Glenn held as well that
the released claims must "affect the res of the debtor's
estate."  Id. at *24.  Judge Glenn then determined that the
third-party releases here were knowing and voluntary, were an
essential component of the Plan, and directly affect the res of
the Debtors' estate.  Id.

In denying the UST's request for a stay, Judge Glenn
observed that the question of the legality of implied consent
through an opt-out process "is a serious one" that has generated
a split among courts and that deserved a decision from reviewing
courts.  On every other factor, however, he ruled against the
UST.  This Court will follow Judge Glenn's lead regarding the
merits of the UST appeal.  That appeal raises a sufficiently
serious legal issue that deserves resolution.

II.  Irreparable Injury

The UST fails to show that it will suffer irreparable
injury absent a stay.  It argues that a stay pending appeal is
necessary to preserve its right to meaningful appellate review
of the legality of the third-party release provision and related
injunction.  It fears that its appeal may be stymied by the
doctrine of equitable mootness.

12

Equitable mootness is "a prudential doctrine under which a district court may in its discretion dismiss a bankruptcy appeal when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." In re BGI, Inc., 772 F.3d 102, 107 (2d Cir. 2014) (citation omitted).  "Unlike constitutional mootness," which goes to a court's subject matter jurisdiction, equitable mootness "is concerned with whether a particular remedy can be granted without unjustly upsetting a debtor's plan of reorganization." In re Charter Commc'ns, Inc., 691 F.3d 476, 481 (2d Cir. 2012). The doctrine therefore "requires the district court to carefully balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief."  Id.

An appeal "is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated."  Id. at 482.  The law describes circumstances in which the presumption may be overcome, including when a court can still order effective relief.  Id.

The UST has failed to show that its appeal will be foreclosed by an invocation of the doctrine of equitable mootness.  The Debtors, UCC, and Abra have each agreed not to argue that the doctrine applies here.  The UST argues that the doctrine does not apply even without these waivers.  The UST

acknowledges that the presumption of equitable mootness that
follows from substantial consummation of a reorganization will
be rebutted here since effective relief can be given on appeal
by excising the third-party release from the Plan.  It concedes
as well that it would be "particularly" inequitable to apply the
doctrine in light of the waivers that have been given.  While
the UST argues that "numerous" other "potential" appellees have
not made such a commitment, it is doubtful that, having failed
to object before the Bankruptcy Court, any other party wishes to
be heard on this issue or would be permitted to be heard on it
for the first time on appeal.[7]

    Next, UST argues that some courts raise the issue of
equitable mootness sua sponte.  Despite being invited by Judge
Glenn to identify an instance when a reviewing court within this
Circuit has sua sponte raised the issue, it has been unable to
do so.  The UST points to decisions of two out-of-circuit
Bankruptcy Appellate Panel decisions.  See In re Pitassi, 666
B.R. 706, 713 (B.A.P. 1st Cir. 2025); see also In re City of
Stockton, California, 542 B.R. 261, 273 (B.A.P. 9th Cir. 2015).

---

[7] In its June 4 reply, the UST notes that Whitebox Advisors LLC
("Whitebox") and its related entities have not agreed to a
waiver of the doctrine of equitable mootness.  Whitebox did not
object to the Plan's inclusion of a third-party release and has
not filed an appeal from the confirmation of the Plan or
participated in UST's appeal or request for an emergency stay.

14

Neither of these decisions is controlling and each can be
distinguished.  The UST has therefore failed to carry its burden
to show irreparable harm, which is essential to its success on
this motion.

    III. Balance of Equities

    The UST has also failed to show that the balance of
hardships favors a stay.  Indeed, the balance tips decidedly
against a stay.

    As reflected in the May 13, 2025 declaration of Joseph
Bliley, the Chief Restructuring Officer of GOL, the Plan is the
product of significant negotiation following substantial
discovery and investigation.  It maximizes the value for the
parties involved in lieu of expensive litigation.  It saves the
Debtors significant costs that would have been spent in
litigation and that could have jeopardized their emergence from
chapter 11.  It provides meaningful recovery to unsecured
creditors who were at risk of receiving nothing.

    In seven detailed paragraphs, Mr. Bliley explains the
function and importance of the third-party releases.  Many of
the released parties provided consideration to the Debtors
during the bankruptcy process.  In settling their claims and
agreeing to the Plan, they waived rights to assert claims
against the Debtors, the Reorganized Debtors, and the others who

have contributed to the success of the Plan.  In his view,
without the releases the Debtors would not be able to emerge
from chapter 11 as a "stronger and more efficient airline."

Mr. Bliley explains as well why time is of the essence and
why a stay beyond the mandatory 14 days, that is, beyond June 4,
is dangerous, costly and significant.  The DIP Facility matures
on June 8, 2025.[8]  Notice of any need to extend was due June 2
and an extension required a $17.5 million extension fee.  In the
event an extension could be negotiated now, it may cost even
more.  Moreover, the daily costs of remaining in bankruptcy
amount to $870,000 per day.

The unsecured creditors will also be significantly harmed
by a stay.  With every passing day, their share of recovery from
the reorganization proceeds declines as Abra's share increases.

The public interest also weighs strongly against a stay.
The UST may pursue its sole legal claim on appeal; GOL may
emerge from bankruptcy; creditors will be able to share in a
recovery; and the finality of bankruptcy proceedings will be
upheld.  Even the UST admits that it does not seek to delay the
Debtors' emergence from bankruptcy.  The public interest lies in
the expedient administration of bankruptcy proceedings, as "the

---

[8] DIP Facility, as defined in the Plan, refers to the
"superpriority senior secured priming debtor-in-possession
financing facility provided to the Debtors."

traditional purpose of bankruptcy laws" is "to provide
reasonably expeditious rehabilitation of financially distressed
debtors with a consequent distribution to creditors who have
acted diligently."   In re Refco Inc., 505 F.3d 109, 118 (2d Cir.
2007) (citation omitted).

## Conclusion

The Court's June 3, 2025 Order imposing an interim stay of
the third-party release and related injunction provisions is
vacated.   The UST's June 2, 2025 motion for a stay pending
appeal is denied.


Dated:    New York, New York
          June 5, 2025


                                    _____
                                        DENISE COTE
                                    United States District Judge