```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :      25cv4610 (DLC)
In Re Gol Linhas Aéreas Inteligentes     :
S.A., et al.                             :      OPINION AND
                                         :         ORDER
---------------------------------------- X
```

APPEARANCES:

For appellant William K. Harrington, United States Trustee for
Region 2:
Linda A. Riffkin
Annie Wells
Rachael E. Siegel
Andrew D. Velez-Rivera
Department of Justice
Office of the United States Trustee
One Bowling Green, Room 534
New York, NY 10004

Ramona D. Elliott
Beth A. Levene
Frederick Gaston Hall
Department of Justice
Executive Office for United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530

For appellees Debtors and Debtors-in-Possession:
Andrew M. Leblanc
Erin E. Dexter
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005

Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
Milbank LLP
55 Hudson Yards
New York, NY 10001

For appellees Ad Hoc Group of Abra Noteholders and DIP Lenders:
Allan S. Brilliant
Gary J. Mennitt

Eric O. Hilmo
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

DENISE COTE, District Judge:

On May 20, 2025, GOL Linhas Aéreas Inteligentes S.A. ("GOL"), a Brazilian airline, and its affiliated debtors and debtors in possession (collectively, "Debtors") filed the Fifth Modified Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan").  The Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order") on May 21.  On May 22, the United States Trustee ("UST") filed a notice of appeal challenging the Plan's third-party release and related injunction provisions, which was docketed in the District Court on June 2.  During a June 5 conference, this Court denied the UST's motion for a stay pending appeal.  Briefing on the appeal became fully submitted on August 27.  For the following reasons, the third-party release and corresponding injunction are stricken from the Plan, and the case is remanded for further proceedings.

## Background

GOL is a large domestic low-cost airline in Brazil with extensive flight networks in South America.  On January 25, 2024, the Debtors filed a voluntary petition in the Southern

District of New York for relief under Chapter 11 of title 11 of the United States Code.  At that time, the Debtors had approximately $4.1 billion of outstanding debt, of which approximately $2.2 billion was secured by the Debtors' assets. The Debtors continued to operate their business as debtors-in-possession.

On December 9, the Debtors proposed a plan of reorganization and a disclosure statement.  The proposed plan and disclosure statement included provisions establishing that creditors would release all related claims against the Debtors unless they affirmatively opted out from doing so.  On December 16, the United States Bankruptcy Court ordered briefing on issues related to these third-party non-debtor releases, noting that "caselaw has been split on permissible methods to establish consent to the granting of third-party releases" "[b]oth before and particularly after the Supreme Court's [2024] decision in Harrington v. Purdue Pharma L.P."  In its briefing, the UST argued that the proposed opt-out mechanism was insufficient under state law to establish a creditor's implied consent to the third-party release.  On March 20, 2025, the Bankruptcy Court rejected the UST's argument and approved the proposed disclosure statement, as well as the solicitation procedures (to which no party objected).

On May 20, the Debtors filed the Plan.  The Plan, and every prior version of the Plan, contained a third-party release provision.  In general terms, Article IX.E, the Plan's third-party release provision, links the released claims to the bankruptcy proceeding, the Debtors, and financial transactions related to the bankruptcy.  It provides in pertinent part:

> Third-party release: Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, . . . each Releasing Party[1] shall be deemed to have . . . released, waived, and discharged the Released Parties[2] from, and covenanted

[1] "Releasing Parties" is defined in the Plan as, "(i) each of the Released Parties; (ii) all holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; (iii) all holders of Claims or Interests that are Unimpaired under the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable notice; (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties.  For the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests."  (Emphasis added.)

[2] "Released Parties" is defined in the Plan as "(i) the Debtors; (ii) the Reorganized Debtors; (iii) the [Official Committee of Unsecured Creditors] and its members; (iv) the other Consenting Stakeholders; (v) the DIP Noteholders, (vi) the Agents/Trustees; (vii) the Ad Hoc Group of Abra Noteholders and Elliott; and (viii) with respect to each of the foregoing Entities and Persons set forth in clause (i) through (vii), each of such Entities' and Persons' Affiliates and its and their respective Related Parties."

4

not to sue on account of, <u>any and all claims</u>, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, . . . in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of a Claim or Interest, including any derivative claims or Causes of Action assertable on behalf of any Releasing Party, based on or <u>relating to</u>, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, <u>the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan</u>, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of [the Plan and its supporting agreements]. . . .

(Emphasis added.)

As the Plan's definition of "Releasing Parties" suggests, all creditors and their "Related Parties",[3] which is another

---

[3] "Related Parties" is defined in the Plan as, "with respect to any Entity or Person, . . . such Entity's or Person's current and former, . . . directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory

broadly defined term, are bound by the third-party release if they did not opt out of it by checking the appropriate box on the ballot or "Notice of Non-Voting Status" sent to them.  The Order confirming the Plan also includes an injunction that, upon the Plan's effective date, implements the third-party releases by enjoining actions to enforce released claims brought against the Released Parties.

The creditors given the opportunity to opt out of the third-party releases fall into two categories: creditors eligible to vote on the Plan, and creditors with unimpaired claims who cannot vote on the Plan but are still subject to the third-party release.  Creditors eligible to vote were sent ballots.  The first page of the ballot stated that, "unless you take additional action as described herein and affirmatively opt out of the Third-Party Release, you will be deemed to release claims you may have against certain non-Debtors."  Pages 5-6 reproduced the third-party release from the disclosure statement, and Page 8 contained a checkbox labeled "OPT OUT of the Third-Party Release."  Creditors whose claims were unimpaired by the Plan and, thus, were ineligible to vote, were

board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees."

sent "Notices of Non-Voting Status."  The Notices contained the same language about the opt-out on the first page, reproduced the third-party release on pages 5-6, and attached a "Release Opt-Out Form."

688 ballots were mailed to creditors who were eligible to vote.  63 of those ballots (approximately 10 percent of the total mailed) were returned as undeliverable.  Of the 617 creditors who returned a ballot, more than half of them (323) chose to opt out of the third-party release.[4]  In addition, 2,603 Notices of Non-Voting Status were sent to creditors who were ineligible to vote, along with attached opt-out forms.  69 of those ballots were returned as undeliverable.  Only 14 of these notices (0.5 percent of those mailed) were returned and, on 11 (almost 80 percent of those returned), the opt-out box was checked.

On May 20, the same day the Debtors filed the Plan, the Bankruptcy Court heard oral argument on the only objection remaining.  The UST had filed an objection to the Plan's confirmation on May 9, once again objecting to the third-party

---

[4] 166 opt-outs were received on standard ballots completed by a single creditor.  Another 157 opt-outs were received on "Master Ballots" sent to so-called "Nominees," or record holders of claims for one or more beneficial holders.  The Nominees who received Master Ballots collected voting information from their beneficial holder clients and filled out Master Ballots to reflect their clients' votes.

releases and the related injunction.  On May 21, the Bankruptcy
Court overruled the UST's objection and entered the Confirmation
Order approving the Plan.  It explained its reasons for doing so
in an Opinion filed on May 22.  In re GOL Linhas Aéreas
Inteligentes S.A., 672 B.R. 129 (Bankr. S.D.N.Y. 2025).

In the Opinion, the Bankruptcy Court explained that it
reads Purdue to bar nonconsensual third-party releases from
Chapter 11 Plans but leave the door open for consensual third-
party releases.  Id. at 163.  The Bankruptcy Court then
concluded that federal, not state law, applies to determine
whether a third-party release was consensual, citing the
approach taken in a Fifth Circuit opinion and other Bankruptcy
Court opinions.  Id. at 164-65.  The Court also justified its
choice of federal law by explaining that the right creditors are
releasing is "the right to have their claims heard by an Article
III court" and that "[a]pplying state contract law" may require
"engag[ing] in untold numbers of individualized choice-of-law
analyses."  Id. at 166-67.  Finally, the Court held that the
third-party releases were consensual because the creditors
impliedly consented to the release by consenting to the
bankruptcy court's jurisdiction; the third-party claims released
"affect the res of the debtor's estate"; and "there [was]

8

adequate service of process" of the releases, given the opt-out response rate.  Id. at 169-72.

On May 23, the UST filed a notice of appeal from the Confirmation Order.  On May 27, the UST filed its Statement of Issues for appeal, challenging the third-party releases and the related injunction once more.  On May 29, the UST moved the Bankruptcy Court for an Expedited Motion for a Stay of the Confirmation Order Pending Appeal.  The Debtors and others objected to the motion and on May 30, following oral argument, the Bankruptcy Court entered an order denying the UST's motion for a stay pending appeal.

On June 2, the UST's notice of appeal was docketed in the District Court.  That same day, the UST moved the District Court for an Emergency Motion to Stay the Plan's third-party releases and related injunction provisions pending appeal.  In the alternative, the UST sought a stay of the Confirmation Order in the event that the Debtors take the position that the third-party releases and injunction provisions are non-severable from the rest of the Plan.  An Order of June 3 set a briefing schedule, scheduled a June 5 hearing, and imposed an interim stay of the Plan's third-party release and injunction provisions until June 6, 2025.

At the June 5 hearing, the Court vacated the interim stay and denied the motion for a stay.  It explained its reasons for the denial in an Opinion filed that same day.  In re Gol Linhas Aéreas Inteligentes S.A., et al., No. 25cv4610, 2025 WL 1591830 (S.D.N.Y. June 5, 2025).  The Court acknowledged that "[the] appeal raises a sufficiently serious legal issue that deserves resolution" but ultimately concluded that UST failed to meet its burden of demonstrating that it would suffer irreparable harm absent a stay and that the balance of equities and the public interest favored a stay.  See id. at *4-*6.  The Debtors had agreed that they would not argue to any court reviewing UST's appeal that the challenge to the third-party releases was equitably moot.

The parties then submitted their merits briefing for the bankruptcy appeal.  The UST filed its opening brief on July 14, contending that the Bankruptcy Court erred by failing to apply state contract law to determine whether the creditors consented to the third-party releases and that, under state law, the creditors' failure to opt out does not imply consent.  The Debtors filed their opposition on August 13.[5]  The Debtors claim

---

[5] On August 13, an ad hoc group of the Debtors' noteholders and lenders filed a motion to join and adopt the arguments set forth in the Debtors' opposition brief.  Having received no objections, the motion is granted.

10

that federal law governs whether the third-party releases are consensual -- but, even if state law were to apply, the creditors who failed to opt out impliedly consented to the releases under well-recognized exceptions.  On August 27, the UST filed its reply and the appeal became fully submitted.

## Discussion

In Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not authorize a court, as part of a Chapter 11 plan of reorganization, to release claims against a nondebtor without the consent of the affected claimants.  Id. at 227.  The Court was careful to note, however, that "[n]othing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan" and that it was not "express[ing] a view on what qualifies as a consensual release."  Id. at 226.  Thus, the key question for a court evaluating third-party releases in a Chapter 11 plan is whether the release was consensual.

As previewed above, the Bankruptcy Court concluded that the third-party releases here were consensual and, thus, permissible under Purdue.  On appeal, a district court reviews "the bankruptcy court's findings of fact for clear error and its legal determinations de novo."  In re Tingling, 990 F.3d 304,

307 (2d Cir. 2021) (citation omitted).  The UST raises three primary challenges to the Bankruptcy Court's decision.  First, the UST contends that the Bankruptcy Court erred in applying federal law rather than state contract law to determine whether the third-party releases were consensual.  Second, the UST argues that state law requires a finding that the third-party releases here were nonconsensual and barred under Purdue.  Lastly, the UST claims that the opt-out mechanism employed here is insufficient to imply consent even under federal law.

Most of the parties' briefing is dedicated to the choice-of-law issue on which, as the Bankruptcy Court recognized in its December 16, 2024 order requesting briefing, "caselaw has been split."  But it is not necessary to decide whether federal or state law controls.  "A choice-of-law analysis need not be performed unless there is an actual conflict between the applicable rules of two relevant jurisdictions."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) (citation omitted).  Here, the same general principles of contract law apply under both federal and state law, so there is no conflict.  Those principles indicate that the third-party releases at issue here are nonconsensual and, thus, barred by the Supreme Court in Purdue.

I.   Application of State Law

The Debtors do not seriously dispute that, under New York state law, the third-party releases would be nonconsensual.  The Bankruptcy Court conceded this point, explaining that state contract laws generally "do[] not recognize silence as consent to a contract."  In re Gol Linhas, 672 B.R. at 165.  Looking to the Restatement (Second) of Contracts for guidance, the New York Court of Appeals has "repeatedly" held that "a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement."  Wu v. Uber Tech., 260 N.E.3d 1060, 1070 (N.Y. 2024) (citation omitted).  As such, "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance."  Restatement (Second) of Contracts § 69, cmt. a (1981).  Similarly, the Second Circuit has explained that "under New York law, silence constitutes assent only in particular circumstances, such as where there is a duty to respond or where there is a contemporaneous oral agreement."  Schnabel v. Trilegiant Corp., 697 F.3d 110, 128 (2d Cir. 2012).

The Debtors concede that, here, the creditors had no duty to respond to the opt-out opportunity.  They also do not claim that any contemporaneous oral agreement was made.  Instead, the Debtors make three cursory arguments to claim that the third-

13

party releases fall under exceptions to the general rule on silence.  They contend that the creditors' silence is sufficient to impute consent because "[e]ach Released Party made substantial contributions to the bankruptcy cases," the creditors had "the opportunity to decline the releases," and, even if the creditors had no duty to respond, the "failure to [respond] may indeed carry consequences."  But the Debtors fail to cite any authority to support their first two arguments.  And the only published opinion the Debtors cite to support their final argument is a pre-Purdue bankruptcy decision that grounds its reasoning in class action law, not state contract law.  See In re Avianca Holdings S.A., 632 B.R. 124, 137-38 (Bankr. S.D.N.Y. 2021).[6]  Thus, Debtors fail to establish that the third-party releases here are consensual under state law.

II.  Application of Federal Law

The Debtors insist that federal law controls this question of consent and that, under federal law, the releases are permissible.  But even under federal law, the third-party

---

[6] The Debtors cite two additional, non-bankruptcy cases to support their argument that the creditors' failure to respond "may indeed carry consequences."  Neither find that a party's silence implies its consent to enter into a contract; both draw from waiver doctrine instead.  See Tatko v. Sheldon Slate Products Co., Inc., 769 N.Y.S.2d 636, 628-29 (N.Y. App. Div. 2003); AXA Global Risks U.S. Ins. Co. v. Sweet Associates, 755 N.Y.S.2d 759, 760-61 (N.Y. App. Div. 2003).

releases are nonconsensual and barred by Purdue.  The Second Circuit has repeatedly held that, "[t]o apply [the] federal common law of contract," courts "look to general principles of contract law."  Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A., 747 F.3d 44, 49 (2d Cir. 2014) (citation omitted); see also McCowan v. Sears, Roebuck & Co., 908 F.2d 1099, 1106 (2d Cir. 1990) (explaining that the federal substantive law of contracts "incorporates generally accepted principles of contract law").  And, as already explained, the general principles of contract law, as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence.  Thus, the third-party releases here are nonconsensual under federal law as well.

The Debtors' arguments to the contrary are not persuasive. Again, the Debtors raise arguments with little to no supporting authority.  First, the Debtors contend that, under federal law, a party that consents to adjudication by a bankruptcy court also consents to the bankruptcy court's "disposition of its claims," including the imposition of a third-party release.  But even assuming the creditors here consented to the bankruptcy court's adjudication, it does not follow that all parties that consent to a bankruptcy court's jurisdiction necessarily consent to any release the court may approve.  Nor did the Debtors cite any

15

case in which a court made that logical leap.  See Wellness Intern. Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (merely requiring that a bankruptcy court obtain "consent to adjudication by a bankruptcy court . . . before hearing and determining a non-core claim" and noting that such consent may be implied (emphasis added)).

Second, the Debtors attempt to import a rule from the class action context in which "opt-out procedures, accompanied by sufficient notice, satisfy the Due Process Clause and establish the consent of parties to be joined to a class settlement."  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985).  But the Debtors acknowledge that Shutts analyzed the question of whether class members who failed to opt out of the class had consented to the court's personal jurisdiction.  Id. at 811-14.  Moreover, Federal Rule of Civil Procedure 23 provides the mechanism for establishing a class and the procedures for protecting the rights of members of a certified class.  There is no suggestion that the releasing parties in this bankruptcy are members of a defined class certified to litigate or settle defined claims or that the Rule 23 procedures and its safeguards have been followed.  The opt-out mechanism utilized in the class action context simply does not apply to the third-party release here.

16

Finally, the Debtors' analogy to default judgments fails for similar reasons. The Debtors contend that creditors who failed to opt out of the release can be bound by the consequences of their inaction, just as default judgments can be entered against parties who fail to respond to pleadings. Once more, however, the Debtors fail to identify any opinion in which a court adopted this reasoning to find that a failure to opt out was sufficient to imply consent, let alone a case adopting this reasoning in the context of a third-party release. Further, it is undisputed that the creditors had no duty to respond to the opt-out opportunity, and courts do not enter default judgments when parties have no duty to respond.

## Conclusion

The U.S. Trustee's June 2, 2025 appeal is granted. The Bankruptcy Court's May 21, 2025 Confirmation Order is reversed and the third-party release and corresponding injunction are stricken from the Plan. This case is remanded for further proceedings.

Dated:    New York, New York
          December 1, 2025

_____
DENISE COTE
United States District Judge

17